UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOBBY DIAL SHOALS,<br><br>    Petitioner,<br><br>    v.<br><br>JEFFREY BEARD,<br><br>    Respondent. | Case No.: 1:13-cv-01178-JLT<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE FILE<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

      Mr. Shoals is in custody of the California Department of Corrections and Rehabilitation serving an indeterminate sentence of 100 years to life plus a determinate sentence of thirteen years, based California's "one strike" law and its "second strike" law.  In this action, Petitioner claims the trial court erred in failing to instruct the jury that it was required to render a unanimous verdict and that it improperly instructed the jury that the testimony of a complaining witness alone was a sufficient basis to find him guilty of a sexual assault.  Because the Court finds there was no error, it **DENIES** the petition.

**PROCEDURAL HISTORY**

      Petitioner appealed his convictions in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed.  ((Doc. 10, Ex. A).   Thereafter, Petitioner filed a petition for review in the California Supreme Court that was also denied.  (Lodged Document ("LD") 20).

On July 29, 2013, Petitioner filed the instant petition. (Doc. 1). Respondent's answer was filed on September 30, 2013. (Doc. 10). On February 2, 2015, Petitioner filed his Traverse. (Doc. 25).

Respondent concedes that the two grounds for relief in the petition have been fully exhausted. (Doc. 10, p. 8).

## **FACTUAL BACKGROUND**

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

C.B. dated defendant between February and August 2008. She ended their relationship because defendant hit her "a couple times." When they broke up, C.B. took her apartment key back from defendant. Defendant called her several times and left "nasty messages" for her, but she never returned the calls.

Around 8:00 p.m. on September 5, 2008, C.B. saw defendant at the apartment complex where his father lived. Defendant asked C.B. if he could visit her at her apartment, and promised not to argue or fight with her. C.B. agreed to a brief visit, and defendant said he would follow her back to her apartment. C.B. went back to her apartment but defendant did not arrive when he said he would.

Around midnight, Gary Jones arrived at C.B.'s apartment and stayed for several hours. C.B. and Jones were in a dating relationship. Around 3:00 a.m., defendant arrived at her apartment, knocked on the door, and tapped at the window. Defendant talked to C.B. through the window and asked to come in. C.B. said no, that she had expected him earlier, but she had company and he needed to leave. Defendant said he was going to "bust all the windows out" if she did not open the door. C.B. refused to let him in, and defendant eventually left.

C.B. testified she went back to sleep, and later realized Jones left while she was sleeping. At some point after Jones left, C.B. was awakened by her bedroom light being turned on. C.B. saw defendant in her bedroom, about three feet away from her. He approached the bed and punched C.B. on the left cheek and ear with a closed fist. The force of the blow knocked C.B. off the bed and onto the floor.

Defendant continued to strike C.B. while she was on the floor. Defendant hit her in the face, mouth, shoulders, and legs. Defendant repeatedly asked C.B. if she was "f* * * * * *?" C.B. said no. Defendant grabbed her arm, told her to stand in front of him, and pulled C.B. close to him. Defendant placed two fingers inside her vagina. C.B. did not try to stop him because she was dizzy and felt physically beaten.

Defendant told C.B. to lie down on the bed. C.B. did not respond, but just stood there and cried. Defendant hit her face again, and she fell on the bed. Defendant removed his belt and said, "'I think you [will] like this, this is what you want.'" Defendant hit C.B.'s buttocks with his belt one time. C.B. crawled toward the headboard to get away from him.

C.B. was very dizzy and in pain, and her ears were ringing. She begged him to stop. Defendant warned C.B., "'[D]on't make me hit you in the face with this belt.'" C.B. finally complied with his order to lie on the bed. Defendant removed his pants, got on top of her, and told her to "be quiet and to shut up." Defendant raped C.B. C.B. was crying, and afraid he would kill her if she

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

resisted. After he finished the sexual act, he put on his pants and left the room. C.B. remained on the bed.

C.B. was still lying on the bed when defendant returned to the bedroom. Defendant raped her again, and then committed an act of sodomy. C.B. repeatedly begged him to stop and said that it hurt. Defendant replied that he had almost completed the sexual act. Defendant finally finished and left the room. C.B. testified she passed out.

C.B. testified that she woke up and felt defendant lying behind her. Defendant told her, "'Yes, I am laying here and you are going to have to deal with it.'" In the morning, C.B. told defendant that she had to go to work. Defendant said that he was not keeping her against her will. C.B. left the apartment and went to work.

**The victim's injuries**

C.B. told her employer what happened to her, and her employer called the police. C.B. went to the hospital for a sexual assault examination. C.B. had multiple bruises and abrasions on her head, arms, back, and buttocks. Her face was swollen and her ear was bleeding. She suffered a ruptured eardrum. She also had superficial lacerations consistent with a nonconsensual act of anal sex. It was stipulated that the physician who treated C.B. believed that a ruptured eardrum constituted great bodily injury. The prosecution introduced photographs which were taken of the victim's injuries.

**Defendant's arrest**

Later on September 6, 2008, Officer Shearer arrested defendant at his apartment on four outstanding warrants. Defendant asked what else he was being arrested for. Shearer again said he was being arrested for outstanding warrants, and defendant again asked if there was anything else. Shearer asked if there was something else to arrest him for, and defendant did not reply.

Defendant was taken to the police department, and advised of the Miranda warnings. Defendant agreed to answer questions. Officer Shearer said he wanted to talk about an incident that occurred earlier that morning at C.B.'s apartment. Defendant said he did not know what Shearer was talking about, and he did not know C.B.

The police collected defendant's clothing, and also obtained blood, hair, and DNA samples from him. Defendant refused to open his mouth for an oral swab.

Defendant then told Officer Shearer that he wanted to talk about the incident. Defendant said that he knew C.B. and he had been at her apartment. Defendant admitted he knocked on her window and saw another man there. He waited for the other man to leave, and then he went into the apartment and talked with C.B. He denied having sex with her that night, and denied hitting her. However, defendant said he had sex with C.B. a few days earlier. He also admitted that he tried to have anal sex with her a few days earlier, but he stopped when she said that she did not like it. C.B.'s DNA was found on biological samples taken from defendant's body.

Defendant was taken into custody. He called C.B. 96 times from jail, from September 6 to November 3, 2008. During the various calls, defendant told C.B., "don't testify please," "they can't make you do it," and "I'm sorry."

**DEFENSE EVIDENCE**

Defendant testified at trial and admitted he had a prior conviction for robbery in 1997. Defendant testified that he dated C.B. for eight months in 2008. Their relationship ended

3

because C.B. was seeing other people behind his back. She wanted to see other men, and she took her apartment key from him. Defendant testified he never hit C.B. during their relationship.

Defendant testified that he saw C.B. at his parents' home on the afternoon of September 5, 2008. C.B. invited defendant to her apartment, and he agreed to come by later that day. However, he wasn't able to get there until around 11:45 p.m. He knocked on the front and back doors, but she did not respond. He tapped on the bedroom window and heard someone ask, "Who is it[?]" Defendant identified himself, and C.B. said to wait a minute. He went back to the front door and saw Gary Jones walk out. Defendant and Jones briefly spoke, and then defendant went into the apartment.

Defendant testified he went into C.B.'s bedroom and talked to her while she was in bed. They started to argue, and C.B. slapped defendant. Defendant slapped her back. C.B. kicked and threw punches at defendant, and he slapped her about three times. Defendant admitted he swung his belt and hit her leg. Defendant testified he had never touched C.B. before that night. Defendant admitted he called her a whore, but denied making any threats.

Defendant testified he went into the front room and had something to eat. About an hour later, C.B. asked him to return to the bedroom. C.B. apologized and they "kissed and made up." Defendant testified they had consensual oral sex, and twice had consensual sexual intercourse. He tried to have anal sex with her, but she asked him to stop. Defendant testified C.B. did not have any injuries on her face and never said her ear was ringing.

Later that day, C.B. called defendant and said she was going to the hospital because her ear hurt. A few hours later, the police arrived and arrested him. Defendant said the officer only talked to him about outstanding tickets. Defendant denied making some of the statements attributed to him by the officer and refusing to cooperate with the oral swab sample. Defendant admitted he did not tell the police that they had sex that night. Defendant also admitted that he repeatedly called C.B. from jail and apologized for slapping her.

(Exh. A, pp. 27-29).

## **DISCUSSION**

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds*

*by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

## II. Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

III.     Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) the trial court erred in failing to instruct the jury on the need for a unanimous verdict; and (2) the trial court erred in instructing the jury pursuant to CALCRIM No. 1190.

A. First Claim

Petitioner first contends that the trial court violated his constitutional right to a fair trial by failing to instruct the jury that its verdict as to Count 8, i.e., assault by means of force likely to cause great bodily injury, must be unanimous. Petitioner argues that evidence of either of two assaults, i.e., a fist blow to the ear and a belt strike on the victim's buttocks, would satisfy the elements of the charged offense, but that the jury was not instructed to be unanimous in which of the two events they believed satisfied the charge. This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**I. The unanimity instruction was not required for count VIII**

In count VIII, defendant was charged and convicted of assault by means of force likely to

produce great bodily injury (§ 245, subd. (a)(1)). Defendant contends the court should have given the unanimity instruction as to this count because there were two separate acts which could have supported the offense: either defendant's acts of punching C.B. in the left cheek and ear with his closed fist, or hitting her buttocks with his belt.

**A. Background**

In closing argument, the prosecutor addressed the acts which supported each of the charged offenses. In the course of the argument, the prosecutor discussed C.B.'s testimony about the sequence of the sexual assault:

> "[Defendant] [c]ame in ... [h]e immediately goes to the bedroom, confronts her, and when she stands up what is the first thing that he does? Pow, right here. And we have got proof of that because you saw the mark, knocks her down, continues to assault her and then beats her with a belt"

The prosecutor offered the following analysis for count VIII:

> "Now, Count 8, this is the last of the counts, what we call a [section] 245, assault on the person, force likely to cause great bodily injury. You will see this in a couple of different places. The first element, the defendant did an act, you have heard this one before....
>
> "The defendant did an act by its nature would directly and probably result in the application of force to a person. There is two different acts here, take your pick. The fist right here or the belt. Now we know the belt was admitted, and you can see the picture. You will actually see, and the defendant admitted you could see the stitch marks from the belt in the picture.
>
> "The force was likely to cause great bodily injury. We know the fist was likely to because it did, but the application of a belted point that it leaves a welt, bruise, call it what you will, but you can still see the stitch marks? Yes.
>
> "The defendant did the act willful. Well, he had to, he either hit her or, you know, knew what he was doing or do it or the belt is exactly the same thing....
>
> "When the defendant acted he was aware of facts that would lead a reasonable person ... to realize that his act by its very nature would directly and probably result in the application of force to somebody. Well, in swinging your fists you know that it is going to—if you're swinging at them it is going to hit them. You swing the belt, exactly the same analysis.
>
> "Finally, when the defendant acted he had the present ability to apply force likely to produce or cause that great bodily injury. We [have] seen the results, so we know that that element is met."

In defense counsel's closing argument, he asserted that defendant's trial testimony was consistent and reasonable, that defendant and C.B. argued, C.B. hit defendant, defendant reflexively slapped C.B., they made up, and they had consensual sex. Defendant asserted that to whatever extent C.B. was injured during their mutual fight, her injuries did not constitute great bodily injuries.

**B. Analysis**

Defendant asserts the court should have given the unanimity instruction as to count VIII, assault by means of force likely to produce great bodily injury, based on the prosecutor's closing

argument that the charge could have been based on defendant's act of either punching C.B. in the face or striking her with the belt.

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.] There are, however, several exceptions to this rule. For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when ... the statute contemplates a continuous course of conduct of a series of acts over a period of time' [citation]. There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime. [Citation.]" (People v. Jennings (2010) 50 Cal.4th 616, 679.)

"'[T]he "continuous course of conduct" exception—when the acts are so closely connected that they form one transaction—is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." [Citation.]' [Citation.]" (People v. Jenkins (1994) 29 Cal.App.4th 287, 299; People v. Bui (2011) 192 Cal.App.4th 1002, 1011.)

While this scenario has been described as an exception to the requirement for the unanimity instruction, "[i]t would seem more accurate to say that, in this situation, a unanimity instruction is required, but the failure to give one is harmless. [Citation.]" (People v. Lueth (2012) 206 Cal.App.4th 189, 196.)

As applied to the instant case, C.B. described a harrowing scene in her bedroom, where defendant surprised her and punched her in the cheek and ear. She fell to the floor, where defendant punched and kicked her. He performed an act of digital penetration and then ordered her onto the bed. When she hesitated, he removed his belt and hit her in the buttocks. When she tried to resist, he threatened to hit her in the face with his belt. He then got onto the bed and raped her. The prosecution introduced photographic evidence of the welt inflicted by the belt, and it was stipulated that C.B.'s physician believed the injury to her ear constituted great bodily injury.

At trial, defendant admitted that he slapped C.B. in the face and hit her with his belt. However, he insisted that she punched him first, and he reflexively hit her back. He also insisted that they reconciled and had consensual sex, and C.B. never said that she was suffering from any pain. In closing argument, defense counsel argued defendant's account was reasonable, and that C.B. did not suffer great bodily injury.

Based on the specific facts of this case, the court's failure to give the unanimity instruction was necessarily harmless since the violent assault occurred within an extremely short period of time, in one isolated location, and defendant tendered the same defense to the entirety of the offenses – that they purportedly engaged in mutual combat, C.B. was not injured, and they had consensual sex. (See, e.g., People v. Robbins (1989) 209 Cal.App.3d 261, 266.)

(Ex. A, pp. 29-31).

2.  Federal Standard.

Claims based on instructional error under state law are not cognizable on federal habeas review. See Estelle, 502 U.S. at 71–72. To receive federal habeas relief for an error in jury instructions,

Petitioner must show that the error so infected the entire trial that the resulting conviction violates due process. See Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "Due process requires that criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that 'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir.2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Additionally, in order to obtain federal habeas relief on this claim, Petitioner "must show that the alleged instructional error had substantial and injurious effect or influence in determining the jury's verdict." Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir.2009) (internal quotation marks and citations omitted). "A substantial and injurious effect means a reasonable probability that the jury would have arrived at a different verdict had the instruction been given." Id. (internal quotation marks and citation omitted). In this case, the burden on Petitioner is especially heavy where the alleged error involves the failure to give an instruction. See id. An omission or an incomplete instruction is less likely to be prejudicial than a misstatement of law. See Henderson, 431 U.S. at 155; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997).

        3.   Analysis.

Specifically as to unanimity instructions, the U.S. Constitution does not require unanimous agreement on the theory underlying a conviction. See Richardson v. United States, 526 U.S. 813, 817 (1999) (federal jury need not unanimously decide which set of facts make up a particular element of a crime); Schad v. Arizona, 501 U.S. 624, 631–32 (1991) (plurality holding that conviction under different theories does not violate due process); see also McKoy v. N. Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) ("[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. [ ] Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.[ ]") (footnotes omitted).

While a California trial court may be required under state law to instruct the jury that it must unanimously agree on the acts underlying the offense in order to convict, federal law is clear that, at least in a non-capital case, there is no federal right to a unanimous jury verdict. Compare, e.g., People v. Diedrich, 31 Cal.3d 263, 280-81 (Cal.1982), and People v. Crawford, 131 Cal.App.3d 591, 595–96 (Cal.Ct.App.1982) (unanimity instruction required where defendant was charged with possession of

one or more firearms by felon and jury could disagree as to particular firearm), with Schad, 501 U.S. at 634 n. 5 ("a state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict"), and Apodaca v. Oregon, 406 U.S. 404, 410–13 (1972) (no constitutional right to unanimous jury verdict in non-capital criminal cases).  Consequently, at least in non-capital criminal cases, courts within the Ninth Circuit have routinely dismissed habeas claims arguing that a California "unanimity" jury instruction was required. See, e.g., Sullivan v. Borg, 1 F.3d 926, 927–28 (9th Cir.1993) (citing Schad to find that instruction allowing California jury to convict defendant of first degree murder without unanimity as to whether he had committed felony murder or premeditated murder did not violate petitioner's due process rights.)

Because there is no federal law requiring a jury verdict to be unanimous, as with any instructional error, the claim fails as a threshold matter. 28 U.S.C. § 2254(d)(1).  Petitioner is entitled to habeas relief *only* if he can show that the trial court's failure to give a unanimity instruction "so infected the entire trial that the resulting conviction violates due process."  Estelle, 502 U .S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396 (1973)). As mentioned above, where the alleged error is failure to give an instruction, the burden on the petitioner is "especially heavy." Henderson, 431 U.S. at 155.

Petitioner has failed to meet this burden. As found by the state court, the evidence depicted a "harrowing" scene in the victim's bedroom, where, during a relatively short period of time, Petitioner surprised the victim, punched her in the cheek and ear, and when she fell to the floor, kicked and punched her again.  After performing an act of digital penetration on her, he ordered her onto the bed; when she hesitated, he removed his belt and struck her in the buttocks with it.  The photographic evidence of the welts inflicted by the belt, along with the stipulation that the blow to the ear constituted great bodily injury both establish key elements of the assaults.  Moreover, Petitioner admitted to slapping the victim in the face and hitting her with the belt.  In addition, the record reflects that the trial court gave the following general unanimity instruction: "Your verdict on each count and any special finding must be unanimous. This means that to return a verdict all of you must agree to it." (LD 10, p. 1310; LD 1, p. 224.)  Finally, as Respondent notes, in closing argument, defense counsel expressed his theory of the case, i.e., a general denial of guilt, by asking the jury to acquit Petitioner on all charges

based on counsel's criticism of the victim's behavior, which, counsel suggested, was not consistent with how rape victims act. (LD 10, pp. 1275; 1287). Clearly, the jury rejected the defense theory of innocence and, under all the circumstances of the case, the Court agrees with Respondent that, given the overwhelming evidence of Petitioner's guilt, it seems unreasonable to suppose that the jury believed Petitioner's blanket denial as to one of the assaults but not as to the other.

Thus, under the circumstances of this case, the trial court's refusal to give a unanimity instruction did not render Petitioner's trial fundamentally unfair. The decision of the state appellate court rejecting this claim is not contrary to nor an unreasonable application of federal law. Accordingly, the claim must be denied.

### B. Second Claim

Petitioner next contends that the trial court's use of the CALCRIM No. 1190 was error. This contention, too, is without merit.

#### 1. The 5th DCA's Opinion.

In rejecting Petitioner's claim, the state appellate court ruled as follows:

> Defendant next contends the court improperly instructed the jury with CALCRIM No. 1190, as to the testimony of a single witness to prove sexual assault offenses. Defendant asserts the instruction erroneously reduced the prosecution's burden of proof.
>
> As relevant to defendant's arguments, the court instructed the jury with CALCRIM No. 1190, that "[c]onviction of a sexual assault crime may be based on the testimony of a complaining witness alone." The court also instructed the jury pursuant to CALCRIM No. 301: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."
>
> Defendant acknowledges that his instructional arguments were rejected in People v. Gammage (1992) 2 Cal.4th 693, which addressed the virtually-identical predecessor instructions, and held they were correct statements of the law and did not reduce the prosecution's burden of proof. (Id. at p. 700.) Defendant attacks the reasoning in Gammage's majority opinion, asserts that the majority opinion is somehow outdated, and urges this court to follow the concurrence in Gammage. We decline to do so. We agree with Gammage and are bound by its conclusions. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

(Ex. A, p. 31).

///

///

///

///

11

2. <u>Analysis</u>.[2]

As Respondent correctly contends, a claim of instructional error that violates state law is not cognizable in federal habeas proceedings. To the extent Petitioner contends the appellate court misinterpreted California law by following the binding precedent of the California Supreme Court in <u>Gammage</u>, 2 Cal.4th 693, such claim is not cognizable by way of § 2254. A determination of state law by a state appellate court is binding in a federal habeas action, <u>Hicks v. Feiock</u>, 485 U.S. 624, 629 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 691 n. 11 (1975); <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in de novo review). A federal court has no basis for disputing a state's interpretation of its own law. <u>Clemons v. Mississippi</u>, 494 U.S. 738, 739–740 (1990).

Here, as the 5th DCA observed, the intermediate appellate court was required to follow the holding of the California Supreme Court in <u>Gammage</u>, as binding precedent. Since such a contention involves only state law principles, and since this Court is bound by a state court's interpretation of its own laws, it is not cognizable in these proceedings.

Moreover, even assuming that a federal claim had been stated, instructional error violates federal due process only when there is a reasonable likelihood that the jury has applied the instruction in a way violative of the federal constitution. <u>Estelle</u>, 502 U.S. at 72. In evaluating whether such a due process violation has occurred, the Court must consider the context of the instructions as a whole and the entire trial record, including arguments of counsel. <u>Id</u>.

CALCRIM 1190 reads, "conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." This instruction followed the trial court's instruction of CALCRIM number 301 which reads that the "testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

In <u>Gammage</u>, the court noted that it was appropriate to give both instructions because even though they overlap to some extent, each one has a different focus:

---

[2] The standard for a habeas claim of instructional error was discussed previously.

1
2
3
4

> CALJIC No. 2.27 focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness. It is given with other instructions advising the jury how to engage in the fact-finding process. CALJIC No. 10.60, on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. It is given with other instructions on the legal elements of the charged crimes.

5  Gammage, 2 Cal.4th at 700–01.

6  Petitioner's argument that these instructions together improperly lightened the prosecutor's

7  burden of proof.  However, again, Gammage specifically spoke to that argument by observing: "[n]or

8  do the instructions dilute[ ] the 'beyond a reasonable doubt' standard. [citation.] The instructions in

9  combination are no less correct, and no less fair to both sides, than either is individually." Gammage, 2

10 Cal.4th at 701.

11 Here, Petitioner provided no evidence that the jurors followed these instructions in a manner

12 that reduced the prosecution's burden of proof or that they did not follow the instruction regarding proof

13 beyond a reasonable doubt.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (noting that jurors are

14 presumed to have followed the instructions provided).  Therefore, not only has the California Supreme

15 Court found that it is proper to give both instructions in combination in cases involving sex offenses,

16 Gammage, supra, but it has also ruled that the trial court is required to give instructions on the "one

17 witness" standard in all cases, not just those involving sexual crimes. People v. Rincon-Pineda, 14

18 Cal.3d 864, 884–85 (1975).  In sum, there is no reason to find that the prosecution's burden of proof

19 was misapplied, and the giving of CALCRIM 1190 and 301 cannot be said to have "so infected the

20 entire trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. at 147.

21 Therefore, Petitioner's claims fail to establish that the state court's adjudication was contrary to

22 or an unreasonable application of clearly established federal law.  Accordingly, the claim must be

23 denied.  Because Petitioner has failed to raise any claims that merit habeas relief, the Court will deny

24 the petition with prejudice.

25 Moreover, the Court declines to issue a certificate of appealability.  A state prisoner seeking a

26 writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and

27 an appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-336

28

(2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court;  or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'."  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

## **ORDER**

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1. The petition for writ of habeas corpus (Doc. 1), is DENIED with prejudice;

2.  The Clerk of the Court is DIRECTED to enter judgment and close the file;

3.  The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:  **October 1, 2015**                     **/s/ Jennifer L. Thurston**
                                                                UNITED STATES MAGISTRATE JUDGE